AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

Fayetteville Division

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Apple Macbook Air, Model A1466
s/n: C1MSWYDXH3QF

)
)
)
)
)
)

Case No. 5:22CM_____

5:22-cm-00051-CDC

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ **Western** _____ District of _____ **Arkansas** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1001(a)(2), 10305(A), 1361, 2261A(2), and 1512(b)(3) | False statements to Government Agents or Agencies, Intentional Damage to a Protected Computer, Depredation of Property of United States, Stalking, Witness Tampering |

The application is based on these facts:

See attached Affidavit of FBI Special Agent Matthew P. Rader.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Matthew S. Rader, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ **telephone** _____ *(specify reliable electronic means).*

Date: **9/9/2022**

*Judge's signature*

City and state: Fayetteville, Arkansas

Christy D. Comstock, United States Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF ARKANSAS

**IN THE MATTER OF THE SEARCH OF TARGET CELL PHONE, TARGET LAPTOP 1, TARGET LAPTOP 2, TARGET TABLET, TARGET HARD DRIVE 1, TARGET HARD DRIVE 2, TARGET WATCH and SIM CARD, CURRENTLY LOCATED AT 3930 NORTH VANTAGE DRIVE, FAYETTEVILLE, ARKANSAS**

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Matthew S. Rader, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

**A.   Purpose of Affidavit**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following property (referred to collectively as the "**TARGET DEVICES**"), which are electronic devices currently in law enforcement possession:

      a.     Apple iPhone 12 Pro Max, s/n: F2LF15420D43 (hereinafter, "**TARGET CELL PHONE**");

      b.     Apple Macbook Pro, Model A2485, s/n: MX4W4WN21C (hereinafter, "**TARGET LAPTOP 1**");

      c.     Apple Macbook Air, Model A1466, s/n: C1MSWYDXH3QF (hereinafter, "**TARGET LAPTOP 2**");

      d.     Apple iPad, Model A1458 with cord, s/n: DMPJM7N0F184 (hereinafter, "**TARGET TABLET**")

e.      Apple My Passport for Mac, cord and adaptor, s/n: WX1D1734*[1]

(hereinafter, "**TARGET EXTERNAL HARD DRIVE 1**");

f.      Western Digital My Book Essential with cord, s/n: WCAZAC285903

(hereinafter, **TARGET EXTERNAL HARD DRIVE 2**); and

g.      Apple Watch with cord and sim card (hereinafter, "**TARGET WATCH and SIM CARD**");

2.      The **TARGET DEVICES** are currently located at the FBI Fayetteville Resident Agency, 3930 North Vantage Drive, Fayetteville, Arkansas.  This Affidavit is submitted in support of search warrants to search the **TARGET DEVICES**, as detailed in Attachment A, for the extraction of electronically stored information described in Attachment B.

3.      As detailed below, the **TARGET DEVICES** were previously located within Victim 2's residence in Harrison, Arkansas (herein, the "Residence") and identified by Victim 2 as belonging to defendant Manfredo Madrigal (MADRIGAL).  The FBI searched the Residence and seized the **TARGET DEVICES** with the consent of Victim 2.  MADRIGAL was charged by complaint in the Western District of Virginia with one count of stalking Victim 1. MADRIGAL was arrested by local law enforcement in Arkansas after a domestic violence incident involving Victim 2.

4.      Based on the information presented herein, I believe there is probable cause to conclude that evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1001(a)(2) (False statements to Government Agents or Agencies), 10305(A) (Intentional Damage to a Protected Computer), 1361 (Depredation of Property of United States), 2261A(2)

---

[1]      The character for "*" was scratched off the device.

(Stalking), and 1512(b)(3) (Witness Tampering) (collectively, the "Target Offenses") are present within the **TARGET DEVICES**, which are believed to have been used by MADRIGAL.

     **B.**    **Agent Background and Experience**

     5.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since November 2005.  As part of my duties, I conduct national security investigations of various criminal violations, to include espionage, economic espionage, theft of intellectual property and trade secrets, and unauthorized access to / exceeding authorized access to a computer system, and other offenses.  I have participated in the execution of numerous search warrants resulting in the seizure of computers, electronic media, digital storage devices and physical evidence.  Through my training and experience, I have gained exposure to operational tradecraft used by representatives of hostile foreign governments, which sometimes leads to contact with United States Government clearance holders.

     6.    By virtue of my employment with the FBI, I have performed a variety of investigative techniques, including conducting arrests and executing federal search warrants. These search warrants have included the search and seizure of evidence from electronic devices used by United States Government employees, among others.  I am also familiar with the fact that many criminals use electronic devices in connection with their illegal conduct including, but not limited to, communicating in furtherance of their criminal activity; taking photographs or videos and/or conducting internet searches related to the criminal conduct; and discussing, attempting to cover-up, or obstructing investigations into such illegal activities.  These communications may be conveyed in verbal, text, and/or image form and I have experience reviewing all such communications.  I also know that the search history or other digitally retained data within an electronic device may be a source of evidence in federal criminal investigations.  Through my work, I have become familiar with the types of evidence often found

within cellular telephones and computers.  I have also participated in interviews of witnesses, subjects, and targets in connection with investigating federal offenses.  As a Special Agent, I am also an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7). This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

      **C.**      **<u>Sources of Information</u>**

      7.      The facts in this affidavit are based on my personal knowledge and participation in the investigation, information gathered by other investigators, my review of law enforcement reports and open-source information, evidence obtained through federal grand jury subpoenas, information obtained from the United States Army (Army), as well as other information that I believe to be reliable. This Affidavit also relies on statements made by one or more victims. Some, but not all, of these victims' statements or reported contacts with MADRIGAL have been corroborated by law enforcement.  Since this affidavit is being submitted for the limited purpose of securing the requested search warrant, I have not included each and every fact known to me concerning this investigation. This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds. Similarly, where information contained in reports and other documents or records are referenced herein, such information is also described in sum and substance and in relevant part only. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

      **II.**      **TARGET OFFENSES**

      8.      Based on the information set forth below, I assert there is probable cause to conclude the Target Offenses have and/or are being committed by the user, owner, and/or

resident of the **SEARCH TARGETS**, Manfredo MADRIGAL.   The elements of the Target Offenses are as follows:

a.        Under 18 U.S.C. § 1001(a)(2), it is unlawful to make a false statement or representation to a department or agency of the United States.   The elements of this offense are as follows: (1) the defendant made a statement or representation; (2) the statement was false, fictitious, or fraudulent; (3) the statement or representation was material; (4) the defendant acted knowingly and willfully; and (5) the statement pertained to a matter within the jurisdiction of the executive, legislative, or judicial branch of the United States government.

b.        Under 18 USC § 1030(a)(5)(A), it is unlawful to intentionally damage a protected computers.   The elements of this offense are as follows: (1) the defendant knowingly caused the transmission of a program, information, a code, or command to a computer; (2) as a result of the transmission, the defendant intentionally impaired without authorization the integrity, availability of data, a program, a system, or information; and (3) the computer was exclusively for the use of the United States government used in or affected interstate or foreign commerce.

c.        Under 18 U.S.C. § 1361, it is unlawful to willfully injure or commit any depredation against any property of the United States.   The elements of the offense are as follows: (1) the defendant injured or committed a depredation against property (r attempted to do so); (2) The property involved was property of the United States or of any department or agency thereof, or property that had been or was being manufactured or constructed for the United States, or for any department or agency thereof; and (3) the defendant acted willfully.

d.      Under 18 U.S.C. § 2261A(2), it is unlawful to cyberstalk another individual.  The elements of the offense are as follows: (1) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person; (2) the defendant used the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that: (a) placed that person in reasonable fear of death of or serious bodily injury to that person, an immediate family member, or a spouse or intimate partner, or that person's animal, or (b) caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to that person, an immediate family member, or a spouse or intimate partner.

9.      Under 18 U.S.C § 1512(b)(3), it is unlawful to tamper with a witness, victim or informant by intimidation, threats, corrupt persuasion, or misleading conduct.  The elements of the offense are as follows: (1) the defendant knowingly (a) intimidated, threatened, or corruptly persuaded another person, or (b) attempted to intimidate, threaten, or corruptly persuade another person, or (c) engaged in misleading conduct toward another person; (2) with the intent to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States; (3) of information relating to the commission or possible commission of a Federal offense.

### III.      PROBABLE CAUSE

#### A.      Overview of Investigation

##### 1.      Background on Manfredo MADRIGAL

10.      In early 2022, the United States initiated a national security investigation into MADRIGAL, a former Army Officer and attorney.  At the time, MADRIGAL was still on

active duty and assigned to the United States Army Judge Advocate General's Legal Center and School (JAG School) in Charlottesville, Virginia.[2]  Per his resume, MADRIGAL's education and professional background include a *Juris Doctor* from the University of Kansas School of Law in 2019, a Master's Degree in Homeland Security in 2019, and admission to the Missouri State Bar in 2020.

11.     Prior to being assigned to the JAG School, MADRIGAL served as an enlisted soldier and non-commissioned officer on active duty in various units, to include the 75th Ranger Regiment and 82nd Airborne Division.  He was trained in the use of a variety of weapons and combat tactics, to include specialized infantry and sniper training.  MADRIGAL served multiple tours of duty in combat zones overseas.

12.     At the time of the initial investigation, the Army was in the process of discharging MADRIGAL for a failure to report an arrest for Driving Under the Influence (DUI).  The DUI occurred prior to MADRIGAL's acceptance to the JAG School.  MADRIGAL was discharged from the Army on or about February 24, 2022.  Following his discharge, MADRIGAL obtained employment with the U.S. Department of Commerce as an International Trade Analyst.  In August 2022, Victim 2 reported to the FBI that MADRIGAL left the Department of Commerce and took a position with the Veteran Affairs Administration.  The FBI recently confirmed Victim 2's report of MADRIGAL's employment change was accurate.

13.     MADRIGAL possesses an active security clearance, which was issued sometime prior to his enrollment in the JAG School.

---

[2]     The JAG School is a graduate-level federal service academy located on the grounds of the University of Virginia and offers courses in a variety of topics, including National Security Law.  *See https://tjaglcs.army.mil/adn.*

### 2.   *Summary of MADRIGAL's Involvement in Alleged Criminal Conduct*

14.     As detailed below, the FBI learned of suspicious activity involving MADRIGAL prior to his discharge from the Army.  MADRIGAL attempted to delete an online training module without authorization overnight between February 6 and 7, 2022.  MADRIGAL filmed himself doing so while using expletives to narrate his motives, including stating: "I'm gonna fuck you."  The module was an interactive program requiring approximately 10 months of collaborative efforts by Army legal personnel to compile it.  The same evening, MADRIGAL informed Victim 1 that Russia reached out to him.  MADRIGAL also conveyed to Victim 1 that Russia wanted to know what he knew and MADRIGAL intended to travel to Russia.  Toll records for MADRIGAL's cellphone show a call placed to the Embassy of the Russian Federation (Russian Embassy), which is consistent with MADRIGAL's statement about having contact with Russia.

15.     MADRIGAL later completed out-processing security paperwork with the Army and claimed no contact with a foreign national while assigned to the JAG School.  As an active-duty Army officer and security clearance holder, MADRIGAL had an affirmative obligation to report foreign contacts while assigned to the school.

16.     In April and May, 2022, FBI interviewed MADRIGAL in Charlottesville, Virginia.  During these recorded interviews, MADRIGAL made numerous false statements regarding his foreign contacts while at the JAG School and his deletion of the training module, as well as other deceptive remarks.

17.     During the investigation, FBI learned that MADRIGAL communicated with Victim 1 about his foreign contact and deletion of the module.  He also engaged in threatening conduct against her.   MADRIGAL's threatening contact against Victim 1 occurred both in-

person and via electronic communications in late 2021 and continuing into June, 2022. This conduct included MADRIGAL sending messages to Victim 1 where he threatened her reputation, career, family, and pet. At least three electronic communications sent by MADRIGAL contained compromising, sexually explicit photographs of Victim 1. Victim 1 indicated these images originated from their live video interactions recorded without her knowledge or consent. Per Victim 1, MADRGIAL used firearms to threaten Victim 1 and damaged her residence in Oklahoma in December 2022. Victim 1 expressed being "terrified" of MADRIGAL in connection with his messages, in-person contact, and voicemails.

18.     Based on the information provided herein, I believe MADRIGAL engaged in cyberstalking of Victim 1 using his cellphone and other means while MADRIGAL resided in Charlottesville, Virginia.

19.     On or about June 9, 2022, MADRIGAL changed his address with the U.S. Postal Service from a residence in Charlottesville to Victim 2's address in Arkansas. On July 18, 2022, the FBI obtained a federal search warrant for location information for MADRIGAL's cellphone. Through the search warrant, the FBI learned MADRIGAL was in the Chicago, Illinois area and he traveled to Arkansas thereafter.

20.     On May 31, 2022, the FBI interviewed MADRIGAL's reportedly former romantic partner, Victim 2. Per Victim 2, they were in a romantic relationship together for eight years before separating in December 2020. Victim 2's name was provided to the FBI by MADRIGAL as someone with information about his activities during his Army discharge. During the interview, Victim 2 claimed MADRIGAL had not told her what her interview would be about. (As described below, Victim 2 later admitted this statement and others made to FBI were false. Victim 2 later stated she was being "coached, for sure" by MADRIGAL about what to say to the FBI.) FBI agents asked Victim 2 about MADRIGAL's background, military

discharge, foreign contacts, and the deletion of the module.  During this interview, Victim 2 stated that MADRIGAL never drank so much that he could not remember events.  Victim 2 claimed MADRIGAL had been verbally, but not physically, abusive.  She previously obtained a restraining order against MADRIGAL, but later dismissed it.

21.     On August 9, 2022, MADRIGAL was arrested in Boone County, Arkansas for an aggravated assault charge involving Victim 2.   Victim 2 called 911 following a domestic dispute culminating in MADRIGAL placing a pistol against Victim 2's head.   MADRIGAL was arrested after deputies arrived.

22.     On August 11, 2022, the FBI interviewed Victim 2 again.[3]  During this second interview, Victim 2 provided new and different information regarding MADRIGAL.   Per Victim 2, MADRIGAL invited Victim 2 to travel from Arkansas to Charlottesville, Virginia to meet with him.  Victim 2 stated she was visiting MADRIGAL in Charlottesville on May 24, 2022 when agents contacted her to arrange the above-interview in Paragraph 20.  Victim 2 admitted that she spent many hours with MADRIGAL during the visit discussing his interview with FBI agents and the information Victim 2 should provide during her upcoming interview with the FBI.  Victim 2 stated they placed their cellphones and Apple watches in another room

---

[3]     Some of the statements made by Victim 2 have not yet been verified by law enforcement. Of note, Victim 2 acknowledged concealing information from FBI agents on a prior occasion at MADRIGAL's direction, as described in subsequent sections of this Affidavit.  Victim 2's statements about the types of threats received from MADRIGAL and explosive anger exhibited by MADRIGAL are consistent, however, with verified threats made by MADRIGAL to Victim 1.

Agents have reviewed email communications between manfredo.madrigal@gmail.com and Victim 2.  In these messages sent and exchanged in the 2018 timeframe, the user of manfredo.madrigal@gmail.com (presumably MADRIGAL) mocked Victim 2's purported infertility, physical attributes, family background, and sexual activity.  These types of remarks are consistent with the harassing and stalking conduct alleged by Victim 1 against MADRIGAL and giving rise to the federal criminal complaint.

of MADRIGAL's apartment to avoid monitoring of their communications.  Victim 2 told agents that they discussed MADRIGAL's planned deletion of text messages from the night he deleted the module.  Victim 2 also stated she had been manipulated by MADRIGAL for an extended period of time and her family members urged her to extricate herself from the relationship.  Victim 2 told the FBI that she was terrified MADRIGAL would kill her and he previously stated a restraining order is "only a piece of paper."

**B.**       **MADRIGAL's Deletion of the Module and Related False Statements**

23.    Based on electronic records, Army investigators and information technology specialists determined electronic links to the JAG School's National Security Law Primer training course material was deleted from their system between 11:00 p.m. on February 6, 2022, and 2:00 a.m. on February 7, 2022.  During this time period, the only person logged into the system with administrative rights to edit, alter, or delete materials was MADRIGAL.

24.    Electronic records show MADRIGAL texted Victim 1 multiple times from MADRIGAL's cellphone between approximately 11:59 p.m, on February 6, 2022, and 1:31 a.m. on February 7, 2022.  MADRIGAL stated: "I am tearing down all of nsl-p"… "I am teaching them a lesson" … "I am going to bring their house down on them" … "Your people went to betray me"… "There is no more NSL-P" … "Do you see the power I have?" …. " I own Everything".  Based on my participation in this investigation, I have learned the National Security Law Primer training module was sometimes referred to as "NSL-P" as shorthand.

25.    Electronic records show MADRIGAL sent Victim 1 a video at approximately 1:50 am on February 7, 2022 from his cellphone.  The video appears to show MADRIGAL deleting training materials from the JAG School computer system used to access training modules.  MADRIGAL made the following statements while deleting course materials:

> "Ya fuck me and I'm gonna fuck you … I own this, this is my bitch … I own you, you're my little fucking cunts … I made this …. You guys decide you're going throw me to the wayside, no, I don't think so … You people thought you can fuck me? … You thought you could easily remove me? … You aren't going to take my knowledge and use it against me … You have nothing you fucking cunt."

JAG School records indicate that MADRIGAL accessed its system during overnight hours at the time of the module deletion. Given the time of day and based on my review of the background setting shown in the video, I believe MADRIGAL was likely located within his Charlottesville residence.

26. Electronic records show MADRIGAL texted Victim 1 multiple times approximately 2:14 a.m. and 2:33 a.m. on February 7, 2022. MADRIGAL stated, in pertinent part:

> "You people fucked with me one too many times […] Try to use me and my knowledge again […] I deleted it all [… ] You should probably teach your people not to fuck work [sic] me […] I just single handily [sic] … Brought an entire system down … Guess what I can do next."

27. During an interview with FBI agents on May 10, 2022, MADRIGAL acknowledged having administrator rights to the computer system that stores JAG school training materials, including the National Security Law Primer course. MADRIGAL indicated he did not let anyone use his log-in credentials to access the training materials. MADRIGAL stated he did not know how the module was deleted. MADRIGAL claimed he learned the module was deleted on Monday, February 7, 2022, when he came to work. MADRIGAL claimed he was informed by another co-worker with administrator rights to the system that a JAG School student reported being unable to access the course material.

C.     **MADRIGAL's Telephonic Contact with the Russian Embassy and Related False Statements**

28.     Electronic records show MADRIGAL texted Victim 1 at approximately 12:04am on February 7, 2022, stating, "Ya, Russia has reached out to me."  At approximately 1:13am, MADRIGAL left a voicemail for Victim 1 stating, in pertinent part, that MADRIGAL was "going to Russia tomorrow."  On February 17, 2022, MADRIGAL texted Victim 1 stating, "The Russians in DC reached out to me, they would like to know what I know."

29.     Verizon telephone records confirmed MADRIGAL is the subscriber for the cellphone used in his communications with Victim 1 and Victim 2, as described herein.  An analysis of toll records for MADRIGAL's cellphone shows no *incoming* calls associated with any known or suspected Russian government facility or official.  The only identified contact between MADRIGAL's cellphone and a Russian government official or facility was an *outgoing* call at approximately 12:29 a.m. on February 7, 2022, which lasted approximately 2 minutes and 26 seconds.  The call was place from MADRIGAL's cellphone to (202) 298-5700. Open-source information identifies this number as being associated with the Russian Embassy in Washington, D.C.  This call occurred in the same general time period that MADRIGAL deleted the JAG School training materials, which I believe occurred while MADRIGAL was located within his Charlottesville residence.

30.     Prior to being discharged from the Army, MADRIGAL completed a JAG School Security Out-Processing ("JAG Form") request on February 22, 2022.  Section 5 of the JAG Form included a section entitled, "Foreign Contact Debriefing."  It asked, "Have you had any contact with a foreign national while assigned to TJAGLCS?"  MADRIGAL marked the "NO" answer block in response to this question.  Section 6 of the JAG Form was entitled "TJAGLCS Security Debriefing."  It stated, "I acknowledge that it is a crime to knowingly make any materially false, fictitious, or fraudulent statement or representation in any matter within the

jurisdiction of the Executive Branch of the United States, per 18 U.S.C. 1001." MADRIGAL signed and dated this section of the JAG Form, thereby affirming that he understood an untruthful statement would create potential criminal exposure. An excerpt of this portion of the form is included below with the pertinent answer circled in red.



31.     During interviews with FBI agents on April 18, 2022, and May 10, 2022, MADRIGAL gave an inaccurate rendition of events involving his foreign contact in February 2022. MADRIGAL asserted he had *never* initiated contact with a representative of the Russian Government for any reason, which is contradicted by his toll records. MADRIGAL claimed he was called in either late January or early February of 2022 by someone who stated he/she was Russian and asked if he had any information he could provide regarding the Russia – Ukraine conflict. MADRIGAL stated he believed it might have been a scam call, and the calling number showed up as (999) 999-9999 on his cellphone. MADRIGAL also stated he researched the number that *called him*, and it was associated with the Russian Embassy in Washington, DC.

32.     Based on the Affiant's experience conducting counterintelligence-focused national security investigations, I assess it would be highly irregular and improbable for a

representative of a hostile foreign government to make an unsolicited, "cold-call" to a United States Government employee to seek intelligence of value.  I also know from previous counterintelligence investigations that when United States Government employees have become disgruntled with their employer or the actions of the United States that some have attempted to contact hostile foreign intelligence services at diplomatic establishments, such as a foreign embassy in the United States and overseas, to volunteer information of value.  Having reviewed MADRIGAL's communications with Victim 1 (including his remarks about Russia wanting to know what he knew and plans to travel), MADRIGAL's recorded deletion of the JAG School module wherein he detailed animosity toward the Army, and toll records for MADRIGAL's cellphone, I believe there is probable cause to conclude that MADRIGAL initiated contact with the Russian Embassy and engaged in a substantive conversation, in contravention to what MADRIGAL informed FBI agents and reported on the JAG Form.

### D.  MADRIGAL's Threatening Communications with Victim 1

33.  MADRIGAL and Victim 1 met while both were assigned to the JAG School in Charlottesville, Virginia.  Victim 1 was subsequently assigned to another duty station but maintained communication with MADRIGAL while he remained in Charlottesville going through the process of being discharged from the Army.  While their relationship began through professional interaction, MADRIGAL and Victim 1's relationship became intimate prior to Victim 1 relocating.  In the late 2021, Victim 1 sought to end her relationship with MADRIGAL.  Victim 1 has used the nickname "Bear," which is relevant to communications described below.

34.  In December 2021, MADRIGAL travelled to Victim 1's residence in another state despite Victim 1 directing him not to do so.  After engaging in an argument, MADRIGAL pulled out a pistol, placed it to his head, and threatened to commit suicide while Victim 1 was in the

same room.   Victim 1 told the FBI that she made efforts to deescalate the situation and MADRIGAL eventually relented to placing his pistol in the garage.   However, MADRIGAL refused to relinquish control over the garage door remote and held onto it.   Victim 1 left the residence and refused to return until MADRIGAL left the residence.   Victim 1 repeatedly asked MADRIGAL via text messages to leave the residence.   Prior to leaving, MADRIGAL damaged and stole some of Victim 1's personal property, attempted to potentially poison Victim 1's cat by grinding up almost an entire bottle of its medication and placing it under its food inside the dish, and left a knife stuck into a food container with an image of a bear on it atop the counter. MADRIGAL also poured water and spread food on the floor, turned the thermostat heat up, and left a patio door open.   MADRIGAL took Victim 1's iPad and personal journal, as well as other belongings.   Victim 1 took photographs documenting some of this damage by MADRIGAL and later shared them with the FBI.   Below is an image showing the knife into the bear image:



35.     In text messages sent on or about December 21, 2022, MADRIGAL sent a series of numbers and letters to Victim 1, which reflected codes and passwords used by Victim 1 to access her accounts and apartment complex.   Then, MADRIGAL added, "I remember all things" and "I like numbers."   These texts conveyed knowledge of codes and passwords used by Victim

1 to access her apartment complex and accounts, as well as her vehicle license plate number. Victim 1 understood these messages to be threatening.

36.     In text message communications on or about January 22, 2022, MADRIGAL and Victim 1 discussed their relationship status.  MADRIGAL asked Victim 1 if he could message Victim 1's father, as MADRIGAL had previously cancelled a planned lunch meeting due to the deterioration of his relationship with Victim 1.  Victim 1 responded, "Nothing about me." MADRIGAL drafted the following text messages and sent a screenshot of it to Victim 1: "Sir, I am not out of the picture.  I understand why you may think that," and "I still love your daughter and we are working our way through life."  Victim 1 responded asking MADRIGAL not to send this text message and to keep Victim 1's father out of it.  These drafted messages inaccurately stated Victim 1's conveyed position on the status of their relationship.

37.     In the same, above-mentioned voicemail left on February 6, 2022, MADRIGAL stated Victim 1 and Victim 1's father "did this" and "I'm coming after him and then you." Victim 1 understood these messages to be threatening and caused concern for her father's safety.

38.     In another series of electronic and verbal communications, MADRIGAL told Victim 1 via cellphone that he was communicating with High-Ranking Officer 1 and other JAG officers to provide them with information potentially damaging to Victim 1's career.

39.     During the course of the text message exchange with Victim 1 noted above, MADRIGAL sent screenshots of conversations he was having with senior officers assigned to the JAG school.

40.     In early March 2022, MADRIGAL left a voicemail for Victim 1 wherein he claimed he just had dinner with High-Ranking Officer 1 and High-Ranking Officer 3. MADRIGAL claimed High-Ranking Officer 1 and High-Ranking Officer 3 agreed with MADRIGAL, that he is not a loser, and they know more about the situation (i.e., MADRIGAL's

discharge from the Army) than Victim 1 does about it.  MADRIGAL said they remarked that Victim 1 lacks any sense of emotional intelligence and is not someone they want among their ranks.  Victim 1 understood these remarks to be intended to damage her reputation and potential career, as well as showing MADRIGAL's ability to garner support of higher-ranking individuals against her.

41.     In early March 2022, MADRIGAL left another voicemail for Victim 1.  In this message, MADRIGAL stated High-Ranking Officer 3 told MADRIGAL not to let Victim 1 "define" him and Victim 1 is "clearly very volatile."

42.     Following an argument between MADRIGAL and Victim 1 about Victim 1 going to a clothing-optional hot spring, MADRIGAL sent an email to Victim 1 on March 10, 2022, which stated: "And [High-Ranking Officer 1] said omg I would never go to a nude hot spring. 'What kind of woman would do that'. 'Especially without her husband, or boyfriend'. 'She [Victim 1] certainly has a lot of moral concerns, I would never let her be a sja'. She has a lot of moral issues."  I believe "sja" is a reference to Staff Judge Advocate, which is an attorney position within the military.   Victim 1 expressed distress to the FBI about MADRIGAL's potential ability to damage her legal career.

43.     In a series of text messages sent in early March 2022, MADRIGAL asked Victim 1 to call him.  After approximately 57 minutes, MADRIGAL sent a picture of a painted assault rifle to Victim 1 followed by these text messages: "I probably should not have sent that" … "Just showing you what I am doing", then 10 minutes later "You haven't called."   Given MADRIGAL's prior Army experience and weapons training, Victim 1 interpreted this message as a potential threat.  Victim 1 conveyed to the FBI that she is less familiar with weapons and MADRIGAL knows it.   The image sent by MADRIGAL is included below:



44.     In early March 2022, MADRIGAL left another voicemail for Victim 1 and stated: "This is your last opportunity to answer the fucking phone and talk to me before I let everyone know exactly who you are."  Victim 1 understood this message to be a threat to convey personal information about her to others.

45.     On or about March 15, 2022, Victim 1 advised MADRIGAL not to contact Victim 1, both verbally and via text message.  Victim 1 blocked MADRIGAL's phone number on Victim 1's cellphone, blocked MADRIGAL on Instagram, and made other applications' profiles "private" to prevent MADRIGAL from tracking her status.

46.     On the evening of June 4, 2022, MADRIGAL sent a series of emails to Victim 1. The first two emails conveyed screenshots MADRIGAL had taken of information he accessed in Victim 1's Modern Fertility application[4] account.  The two screenshots show that Victim 1 had recently had sexual intercourse and a negative pregnancy test afterwards.  Victim 1 stated she had changed the password on the account after terminating their relationship and did not know how MADRIGAL accessed the account.

---

[4]     Per open-source research, Modern Fertility is a free ovulation and cycle tracking application that "makes it easier to predict the 2 days you're most likely to get pregnant – whether you're trying for kids or not."

47.    MADRIGAL then sent an email stating, "sorry to see you are still a failure." Victim 1 interpreted this comment as an intentionally demeaning remark based on her potential fertility challenges and MADRIGAL's inability to impregnate her.

48.    MADRIGAL then sent an email stating, "I'm going to have fun with [an individual referred to herein as "Victim 1's Professional Colleague"]," which Victim 1 interpreted as MADRIGAL believing he knew with whom Victim 1 had sex.  Victim 1 did not know how MADRIGAL knew that Victim 1's Professional Colleague worked in her unit.

49.    After the above exchange, MADRIGAL sent a series of emails, three of which contained compromising sexually explicit photos of Victim 1.  Victim 1 told the FBI these images originated from their previous live video interactions.  Victim 1 reported MADRIGAL must have recorded these interactions without her knowledge or consent.  MADRIGAL stated in one email, "You tried so hard."  MADRIGAL stated in a subsequent email, "Nobody is going to know you like I do.  Don't let them fool you.  Bear."  MADRIGAL's reference to "Bear" demonstrates his knowledge that Victim 1 has gone by this nickname.

50.    Victim 1 stayed at a friend's residence after receiving these messages.  Victim 1 did so because she feared MADRIGAL's reaction to learning that Victim 1 had sexual intercourse with another person and MADRIGAL had previously travelled to Victim 1's residence despite her advising MADRIGAL not to do so.

E.    **MADRIGAL's Assault of Victim 2 and Victim 2's FBI Interview in August 2022**

48.    On August 9, 2022, Victim 2 called 911 and reported that MADRIGAL smashed a wine bottle and put a pistol to her head after a dispute about their dogs at her home in Harrison, Arkansas (i.e., "the Residence").  This dispute occurred while MADRIGAL was residing and

working remotely from her home.[5]  Victim 2 showed deputies from the Boone County, Arkansas Sheriff's Office an image from one or more of her security cameras showing MADRIGAL pointing a pistol at her head.  Deputies arrested MADRIGAL and transported him to a local jail. Below is an image captured by one of the cameras, which shows MADRIGAL pointing a firearm at Victim 2:



49.      When FBI interviewed Victim 2 on August 11, 2022, she provided new and different information than previously given to agents.  Victim 2 stated MADRIGAL previously told her that he had valuable information and he could call the Russians.  Victim 2 stated MADRIGAL told her what he spoke about with FBI and she knew in advance what topics might be addressed in her interview.  Victim 2 reported that she flew out to visit MADRIGAL in late May 2022 at his request.  During the visit, Victim 2 received a phone call on May 24, 2022 from FBI agents in Arkansas seeking to interview her.  Victim 2 expressed that MADRIGAL had

---

[5]      Per statements later made to FBI by Victim 2, MADRIGAL left his employment with the Department of Commerce and obtained a new position with the Department of Veterans Affairs. Victim 2 stated MADRIGAL told his employer that he resided in the Chicago, Illinois area so he would be paid approximately $10,000 more than if he stated he was working remotely from Arkansas.  Your Affiant understands this is likely a reference to locality pay, which is scaled to reflect the different costs of living in a particular region.

provided her name to the FBI to interview because he could manipulate her.  Victim 2 stated they spent time looking at MADRIGAL's toll records to develop a plausible story for the FBI regarding his foreign contacts.  MADRIGAL also admitted to Victim 2 that he deleted the module.  Victim 2 stated they spent three hours talking and walked around outside a nearby mall to avoid being monitored.  In addition, Victim 2 reported they placed their cellphones and Apple watches in another room in MADRIGAL's Charlottesville apartment to avoid being monitored.  In anticipation of Victim 2's expected interview with the FBI, Victim 2 conveyed that she was "being coached, for sure" by MADRIGAL.  Victim 2 stated it was confusing to remember what he *told* her to remember versus what she *actually* remembered.  In advance of Victim 2's interview with the FBI, they planned code words to communicate about whether or not her interview had gone well.  Per Victim 2, the word "Sriracha" or phrase "melons in the garden" would be used to reflect a positive or negative outcome, respectively.

50.     Later, FBI agents interviewed Victim 2 upon her return to Arkansas on May 31, 2022.  During the interview, Victim 2 stated MADRIGAL had *not* told her what the interview would be about, but he had mentioned her name to agents.[6]  Victim 2 reported that MADRIGAL consumed alcohol and had a DUI.  However, Victim 2 claimed MADRIGAL's alcohol consumption did not affect his ability to remember what occurred.  After her interview, Victim 2 stated she contacted MADRIGAL and provided him via Snapchat with a "transcript" of her exchange with the FBI.[7]  After receiving the "transcript," MADRIGAL called Victim 2 and

---

[6]     These statements and others contradict Victim 2's later admissions to the FBI in August 2022.  Victim 2's interview in August is discussed in subsections herein.

[7]     Victim 2 told the FBI in August of 2022 that she had recorded her May 2022 interview with agents, but hid the recording from MADRIGAL for fear he would be angry about some of her responses.  Victim 2 purposefully edited the "transcript" sent to MADRIGAL to remove information that might anger him.

yelled at her and said she should not have said that drinking did not impact his memory.  Based on the context of this remark and MADRIGAL's prior statements to FBI, I believe MADRIGAL was likely angry that Victim 2 undermined a potential defense of not remembering misconduct due to alcohol consumption.

51.     On August 11, 2022, Victim 2 provided FBI with information about threats, violence, and other intimidating behavior she experienced from MADRIGAL.  Victim 2 reported the following: MADRIGAL filed a false report with the licensing entity related to Victim 2's employment wherein he claimed Victim 2 consumed multiple drugs;[8] MADRIGAL remarked he would be prepared to defend himself from law enforcement; MADRIGAL placed firearms in the open at Victim 2's residence, including on her countertop, despite her expressed discomfort with firearms; MADRIGAL said, "I could fucking kill you if I wanted to"; MADRIGAL choked her; and MADRIGAL told her that a protective order was "only a piece of paper."

52.     Victim 2 expressed concern for her person and family members' safety.  Victim 2 admitted that she went into MADRIGAL's cellphone after his arrest at her residence.  Victim 2 deleted her family members' cellphone numbers, her prior text messages with MADRIGAL, and a video MADRIGAL took of her during their dispute.  Victim 2 told the FBI she deleted her family members' contacts to protect them.  However, Victim 2 stated she saved communications with MADRIGAL on her electronic devices.

53.     On August 12, 2022, Victim 2 voluntarily provided her cellphone and laptop to the FBI to show communications received from MADRIGAL.  Victim 2 further indicated MADRIGAL's electronic devices remained at her residence following MADRIGAL's arrest.

---

[8]     Victim 2 advised that she is routinely drug-tested as a nurse and these allegations were false.

Rader Aff. In Support of App. for Search Warrants
[Under Seal]

54.     Soon thereafter, the FBI returned to Victim 2's residence and she voluntarily provided consent to search her residence for evidence related to the Target Offenses.  During this consent-based search, the FBI obtained the **TARGET DEVICES**, which Victim 2 identified as devices used by MADRIGAL.

55.     Victim 2 reported to FBI that MADRIGAL possessed a hard drive containing sexually explicit material related to Victim 1 and Victim 2.  Victim 2 advised that MADRGIAL kept these items in folders labeled with their names.  Relatedly, Victim 1 reported to the FBI that MADRIGAL traveled with a hard drive.

56.     Based on my training and experience, I know that individuals will often store images, videos, and communications on exterior hard drives, as well as their primary laptop or tablet to protect against loss of data.  Here, I believe there is probable cause to conclude that all of the **TARGET DEVICES** are likely to contain evidence of the Target Offenses for the reasons detailed herein.

### F.     Additional Probable Cause Related to the TARGET DEVICES

53.     The **TARGET DEVICES** are currently in the possession of the FBI.  They came into the FBI's possession after being seized with the consent of Victim 2 from her residence following MADRIGAL's arrest and due to FBI's concerns about the preservation of evidence in its ongoing investigation into MADRIGAL.

54.     As detailed above, the FBI has developed information to support a probable cause determination that MADRIGAL used digital devices in connection with the Target Offenses.  In particular, the FBI believes MADRIGAL used one or more laptops, cellular communication devices (e.g. cellphone, iPad, and an Apple watch), and external storage media to send, receive,

and/or store threatening communications or compromising images involving Victim 1 and Victim 2, and to otherwise engage in other conduct involving the Target Offenses.[9]

55.     The FBI's investigation also developed information raising concerns about the destruction and/or alteration of evidence.  On August 12, 2022, FBI agents were informed MADRIGAL's brother, ROBERT MADRIGAL (ROBERT), contacted the Boone County Sheriff's Office where MADRIGAL was detained and asked where MADRIGAL's phone was located.  Late that evening, ROBERT was telephonically interviewed by the FBI about his interest in his brother's cellphone.  During the interview, ROBERT's statements evolved from claiming concern for the device's location to admissions that he and other family members took steps to access MADRIGAL's iCloud account.  ROBERT described a group text exchange with his family about one or more calls received from MADRIGAL while in-custody.  ROBERT admitted that his sister successfully gained access to MADRIGAL's iCloud account, which allowed her to view his iPad device.  Per ROBERT, his sister was unable to find information related to MADRIGAL's cellphone. ROBERT claimed he and other family members were concerned Victim 2 may manipulate MADRIGAL's electronic devices while he was in-custody.

56.     Around this same time frame, the FBI took MADRIGAL into federal custody. While transporting MADRIGAL from Boone County Sheriff's Office to another detention facility, FBI agents noted MADRIGAL had written "Apple ID" and "Dad," along with other

---

[9]     The FBI has reviewed numerous threatening emails provided by Victim 2 and sent to her by MADRIGAL.  An example of MADRIGAL's email communications to Victim 2 includes the following message sent on or about April 1, 2017: "like I told you I will fucking ruin you by showing every everyone the truth. the pictures you sent me months after [Victim 2's deceased husband] died are next unless you call."  Per FBI's preliminary review of email messages between MADRIGAL and Victim 2, MADRIGAL repeatedly used threats of sharing (presumably compromising) images as a mechanism to generate a response from Victim 2.  The FBI has identified emails occurring over a multi-year period where MADRIGAL threatens Victim 2.  Based on the investigation to date, the FBI believes MADRIGAL was residing in the Charlottesville area for a portion of this time period.

notes, on a piece of paper.  The piece of paper also contained two phone numbers with Chicago-based area codes.  Boone County Sheriff's Office confirmed MADRIGAL had telephonic contact with his father while detained.

57.     Based on the statements of MADRIGAL's brother, MADRIGAL's notes, MADRIGAL's telephonic communication with his father, the FBI's prior assessment of MADRIGAL's dishonesty with agents, and Victim 2's statements about MADRIGAL's deletion of messages pertinent to the FBI's investigation, the FBI was concerned about the preservation of evidence pertinent to the Target Offenses likely stored on the **TARGET DEVICES**.

58.     Based on MADRIGAL's prior conduct, the FBI was also concerned that MADRIGAL may seek to delete, conceal, and/or alter evidence if/when MADRIGAL is released from custody.  Therefore, the FBI sought and obtained permission from Victim 2 to enter her residence, collect the **TARGET DEVICES**, and examine them.  Despite the consent of Victim 2, the FBI submits this Affidavit in an abundance of caution in support of search warrants to search the **TARGET DEVICES** for evidence of the Target Offenses, as detailed in Attachment B.

59.     The Devices are currently in storage at the FBI Fayetteville Resident Agency, 3930 North Vantage Drive, Fayetteville, Arkansas.  In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI.

## IV.  TECHNICAL TERMS

60.     Based on my training and experience, I use the following technical terms to convey the following meanings:

RADER AFF. IN SUPPORT OF APP. FOR SEARCH WARRANTS
[UNDER SEAL]

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  An Apple watch connects to an iPhone and can be used to deliver notifications, make calls, send texts, record voice memos, unlock passwords and notes, use Apple pay features, check emails, run applications, and engage in other features in conjunction with the paired cellular device.

b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen

for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

       c.      <u>GPS</u>:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

       d.      <u>PDA</u>:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-

processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e.      Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

f.      IP Address:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.      Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

61.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that

the **TARGET DEVICES** have capabilities that allow it to serve as to be used to store messages, photographs, text communications, emails, and other such digital data.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### V.  ELECTRONIC STORAGE AND FORENSIC ANALYSIS

62.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

63.    With regard to the laptop devices, there is probable cause to believe that things that were once stored on these devices may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

64.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the laptop device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the laptop device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal

information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.    I know that when an individual uses an electronic device to obtain unauthorized access to a victim's account, such as her menstruation tracking application,

the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

65.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

66.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VI.  CONCLUSION

67.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICES** described in Attachments A to seek the items described in Attachment B.

## VII.   REQUEST FOR SEALING

68.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application

and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation, including individuals involved in the potential alteration, deletion, and/or modification of evidence will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

MATTHEW S. RADER
Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and sworn
and attested to by telephone on this 9th day of September 2022:

CHRISTY D. COMSTOCK
UNITED STATES MAGISTRATE JUDGE

RADER AFF. IN SUPPORT OF APP. FOR SEARCH WARRANTS
[UNDER SEAL]

34

**ATTACHMENT A**

**TARGET DEVICES**

The property to be searched is as follows:

(1)      Apple iPhone 12 Pro Max, s/n: F2LF15420D43 - **TARGET CELL PHONE;**

(2)      Apple Macbook Pro, Model A2485, s/n: MX4W4WN21C - **TARGET LAPTOP 1**;

(3)      Apple Macbook Air, Model A1466, s/n: C1MSWYDXH3QF - **TARGET LAPTOP 2**;

(4)      Apple iPad, Model A1458 with cord, s/n: DMPJM7N0F184 - **TARGET TABLET**;

(5)      Apple My Passport for Mac, cord and adaptor, s/n: WX1D1734*CC  (the character for * was scratched off the device) - **TARGET EXTERNAL HARD DRIVE 1**;

(6)      Western Digital My Book Essential with cord, s/n: WCAZAC285903 - **TARGET EXTERNAL HARD DRIVE 2**; and

(7)      Apple Watch with cord and sim card - **TARGET WATCH and SIM CARD**;


         The **TARGET DEVICES** are currently located at the FBI Fayetteville Resident Agency, 3930 North Vantage Drive, Fayetteville, Arkansas.  This warrant authorizes the forensic examination of the **TARGET DEVICES** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of

18 U.S.C. §§ 1001(a)(2) (False statements to Government Agents or Agencies), 10305(A)

(Intentional Damage to a Protected Computer), 1361 (Depredation of Property of United States),

2261A(2) (Stalking), and 1512(b)(3) (Witness Tampering) (collectively, the "Target

Offenses") and involve Manfredo MADRIGAL, including:

    a.      Records, communications, images, or videos involving or regarding:

        1.      the National Security Law Primer (NSL-P);

        2.      Russia, Ukraine, embassies, or overseas travel;

        3.      contact or attempts to contact foreign nationals;

        4.      MADRIGAL's sentiments towards the JAG School, the U.S.
Army, and/or United States in general;

        5.      sensitive military strategies or operations, deployment
information, or training materials;

        6.      the FBI;

        7.      MARDRIGAL's work at the JAG School;

        8.      MADRIGAL's discharge from the U.S. Army;

        9.      MADRIGAL's employment, including applications and related
submissions;

        10.      MADRIGAL's arrest(s) for Driving Under the Influence;

        11.      possession of firearms, ammunition, other weapons;

        12.      communications with others about MADRIGAL's state of mind
between December 2021;

13.     research or evidence of deletion of materials belonging to the JAG School;

14.     the provision of cellular telephone or internet services or billing for such services;

15.     suicide or mental instability between 2017 and present;

16.     domestic violence threats;

17.     Victim 1, Victim 1's pet, Victim 1's family members or colleagues;

18.     tracking of menstruation, pregnancies, and/or sexual activities;

19.     transmission or storage of sexually explicit materials;

20.     travel related to visiting Victim 1, Victim 2, and/or their family members;

21.     passwords or codes related to accounts held or used by Victim 1, Victim 2, and/or MADRIGAL;

22.     threatening/intimidating communications involving Victim 1, Victim 2, or the families, spouse(s), friends, or associates of Victim 1 or Victim 2;

23.     photographs, videos, or other images of Victim 1 or Victim 2;

24.     information regarding the careers of Victim 1 or Victim 2;

25.     security clearances or background check information; and

26.     the attempted or actual deletion of evidence related to the Target Offenses;

b. Any other evidence indicating the state of mind or intent of MADRIGAL as it relates to the Target Offenses, including contextual information necessary to understand the evidence described in this attachment, which constitutes evidence of the Target Offenses; and

2. Evidence of user attribution showing who used or owned the device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol addresses to communicate with Victim 2, Victim 1, and other witnesses about the Target Offenses, including:

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted

RADER AFF. IN SUPPORT OF APP. FOR SEARCH WARRANTS
[UNDER SEAL]

3

by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.